1
2
3
4
5
6
7

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

8

*Attorneys for Plaintiffs*

9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11
12
13

SONNI ECHEVERRIA-CORZAN, and
THOMAS SIMMONS, individuals, on behalf
of themselves, the general public, and those
similarly situated,

14

Plaintiffs,

15

v.

16

MICHAELS STORES, INC.,

17

Defendant.

CASE NO.

CLASS ACTION COMPLAINT FOR
INVASION OF PRIVACY; INTRUSION
UPON SECLUSION; WIRETAPPING IN
VIOLATION OF THE CALIFORNIA
INVASION OF PRIVACY ACT
(CALIFORNIA PENAL CODE § 631); USE
OF A PEN REGISTER IN VIOLATION OF
THE CALIFORNIA INVASION OF
PRIVACY ACT (CALIFORNIA PENAL
CODE § 638.51); COMMON LAW FRAUD,
DECEIT AND/OR
MISREPRESENTATION; UNJUST
ENRICHMENT; AND TRESPASS TO
CHATTELS

JURY TRIAL DEMANDED

18
19
20
21
22
23
24
25
26
27
28

- 1 -

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................4

THE PARTIES...................................................................................................6

JURISDICTION AND VENUE ..........................................................................6

SUBSTANTIVE ALLEGATIONS ......................................................................8

    A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers. ...........................................................................8

    B.    Defendant Falsely Informed Users That They Could Choose to Disable or "Opt-Out" from the Website's Use of Such Cookies. ..................................................12

    C.    The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendant's Website. ...........................................21

        1.    Facebook Cookies.......................................................................21

        2.    Google Cookies...........................................................................25

        3.    TikTok Cookies ..........................................................................30

        4.    Adobe Cookies............................................................................33

        5.    Microsoft Bing Cookies...............................................................35

        6.    LiveRamp Cookies......................................................................38

        7.    Additional Third Party Cookies....................................................39

    D.    The Private Communications Collected are Valuable. .......................................43

PLAINTIFFS' EXPERIENCES ........................................................................44

CLASS ALLEGATIONS .................................................................................52

CAUSES OF ACTION .....................................................................................54

    First Cause of Action: Invasion of Privacy........................................................54

    Second Cause of Action: Intrusion Upon Seclusion........................................57

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)........................................................59

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)...............................................63

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation............65

    Sixth Cause of Action: Unjust Enrichment........................................................68

CLASS ACTION COMPLAINT

Seventh Cause of Action: Trespass to Chattels ..............................................................69

CLASS ACTION COMPLAINT

Plaintiffs Thomas Simmons and Sonni Echeverria-Corzan ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Michaels Stores, Inc. ("Defendant" or "Michaels"). Plaintiffs' allegations against Defendant are based upon information, belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiff, which are based upon Plaintiffs' personal knowledge.

**INTRODUCTION**

1.      This Class Action Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law. When consumers visit Defendant's ecommerce website (www.michaels.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can "disable" cookies by clicking or selecting the "Cookie Preferences" link, as shown in the following screenshot:

This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. To learn more about cookies, including how to disable them, click on Cookie Preferences.

 

2.      Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. However, unlike other websites, Defendant's Website offers consumers a choice to browse without being tracked, followed, and targeted by third party data brokers and advertisers. But, Defendant's promises are outright lies, designed to lull users into a false sense of security. Even after users elect to opt-out of or reject all non-required cookies, Defendant surreptitiously causes several third parties—including Meta Platforms, Inc. (Facebook), Google LLC (DoubleClick and Google), ByteDance Ltd. (TikTok), Adobe Inc. (dpm.demdex.net), Microsoft Corporation (Microsoft Bing, AppNexus), LiveRamp Holdings, Inc. (Pippio), The

Trade Desk, Inc. Yahoo, Inc., PubMatic, Inc., Pinterest, Inc., Snap Inc. (SnapChat), and Criteo S.A., among others (together the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Website.

3.      Contrary to their express declination or rejection of cookies and tracking technologies on the Website, Defendant nonetheless caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These third-party cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

4.      The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5.      This type of tracking and data sharing is exactly what the Website visitors who chose to reject all unnecessary cookies through the Website's Cookie Preference Center window sought to avoid. Defendant falsely told Website users that it respected their privacy and that they could avoid tracking and data sharing when they browsed the Website. Despite receiving notice of consumers' express declination of consent, Defendant defied it and violated state statutes, tort duties, and also breached its contractual duties and the implied covenant of good faith and fair dealing with Plaintiffs and those similarly situated Website users.

1

**THE PARTIES**

2      6.      Plaintiff Sonni Echeverria-Corzan is, and was at all relevant times, an individual

3   and resident of Oakland, California. Plaintiff Echeverria-Corzan intends to remain in California

4   and makes her permanent home there.

5      7.      Plaintiff Thomas Simmons is, and was at all relevant times, an individual and

6   resident of Van Nuys, California. Plaintiff Simmons intends to remain in California and makes

7   his permanent home there.

8      8.      Defendant Michaels Stores, Inc. is a Delaware limited liability corporation with

9   its headquarters and principal place of business in Irving, Texas.

10   **JURISDICTION AND VENUE**

11      9.      This Court has jurisdiction over the subject matter of this action pursuant to 28

12   U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of

13   interest and costs; and Plaintiffs and Defendant are citizens of different states.

14      10.     The injuries, damages and/or harm upon which this action is based, occurred or

15   arose out of activities engaged in by Defendant within, affecting, and emanating from, the State

16   of California. Defendant regularly conducts and/or solicits business in, engages in other

17   persistent courses of conduct in, and/or derives substantial revenue from products and services

18   provided to persons in the State of California. Defendant has engaged, and continues to engage,

19   in substantial and continuous business practices in the State of California.

20      11.     Further, the Private Communications and data which Defendant causes to be

21   transmitted to Third Parties are routed through servers located in California.

22      12.     There are approximately 130 Michael's retail stores in California. Defendant

23   operates regional processing centers and distribution centers in California. In its 2012 tax return,

24   Defendant identified California among its "major jurisdictions."

25      13.     Defendant's former CEO Ashley Buchanan highlighted the "180-person in-house

26   coding team," which he said gives Michael's a speed-to-market advantage over rivals.

27      14.     Defendant has made pushes into online sales, making its Website critical to its

28

CLASS ACTION COMPLAINT

growth. It upgraded its online marketplace, MakerPlace, and expanded its delivery options to include Uber Eats, DoorDash, and Instacart as partners to take advantage of online consumers. Defendant's web sales are projected to reach $1.06 billion in 2025, demonstrating the importance of its online presence and marketing. Thus, using consumer's data to maintain existing consumers and retain new ones is a critical piece of Defendant's growth strategy.

15.    The Website has first-party cookies controlled and placed by Defendant that collect geolocation data from each user that visits the Website. Defendant therefore knows when users are from California and intentionally collects their data.

16.    When a user is from California, the Website presents different content. For example, it lists the closest Michael's retail store based on the geolocation data it collects. In the below example, a user in Los Angeles went to the Website and therefore "South La Brea" is listed as the retail store:



17.    While knowing that user's device is located in California, Defendant surreptitiously caused third-party cookies to be placed on the device, tracking its physical location, and collecting data regarding the user's online activity. That data is then used by Defendant and third-parties to boost performance and revenue. For the reasons stated herein, Defendant is subject to specific jurisdiction in California.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

19.    Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

CLASS ACTION COMPLAINT

1

**SUBSTANTIVE ALLEGATIONS**

2

A.    **Defendant Programmed the Website to Include Third-Party Resources that**
      **Utilize Cookie Trackers.**

3

4        20.    Every website, including the Website, is hosted by a server that sends and

5   receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to

6   and from Internet users' browsers. For example, when a user clicks on a hyperlink on the

7   Website, the user's browser sends a "GET" request to the Website's server. The GET request

8   tells the Website server what information is being requested (e.g., the URL of the webpage being

9   requested) and instructs the Website's server to send the information back to the user (e.g., the

10  content of the webpage being requested). When the Website server receives an HTTP request, it

11  processes that request and sends back an HTTP response. The HTTP request includes the client's

12  IP address so that the Website server to knows where to send the HTTP response.

13       21.    An IP address (Internet Protocol address) is a unique numerical label assigned to

14  each device connected to a network that uses the Internet Protocol for communication, typically

15  expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4

16  addresses). IP addresses can identify the network a device is on and the specific device within

17  that network. Public IP addresses used for internet-facing devices reveal geographical locations,

18  such as country, city, or region, through IP geolocation databases.

19       22.    As a result, Defendant knew that the device or devices used by Plaintiffs and

20  Class members to access the Website was located in California.

21       23.    Defendant voluntarily integrated "third-party resources" from the Third Parties

22  into its Website programming. "Third-party resources" refer to tools, content or services

23  provided by third-parties, such as analytics tools, advertising networks, or payment processors,

24  that a website developer utilizes by embedding scripts, styles, media, or application

25  programming interface (API) into the website's code. Defendant's use of the third-party

26  resources on the Website is done so pursuant to agreements between Defendant and those Third

27  Parties.

28

CLASS ACTION COMPLAINT

24.     The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which causes the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, causing the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

25.     First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

26.     A third-party cookie is set by a third-party domain/webserver (e.g., www.google.com; bat.bing.com; analytics.tiktok.com; www.facebook.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

27.     As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, causing them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

28.     Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing

campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

29.    Defendant sells arts and crafts supplies and home décor products at over 1,300 retail locations across the United States. Defendant also owns and operates the Website, which allows visitors to receive information about its stores and products and purchase products. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

30.    Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies.  Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the software code of its Website, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

31.    Defendant explained the third-party cookies it used on the Website as follows in its Privacy Statement:

> Cookies. A cookie is a small file placed on your computer when you visit a site that can be understood by the site that issued the cookie. We use cookies to monitor how our sites are used and to help personalize your online experience. For example, when you register on our sites, we may store a unique code in a cookie on your

computer. The next time you come back to the site from that computer, our servers use the cookie to recognize you. We can then use the information you provided when you registered combined with your activities on our sites to provide you advertising and offers of interest…

Third-Party Advertising. We allow third parties, including business partners and ad networks, to display advertising on our sites. Some of these companies place a cookie on your computer to recognize your computer each time they send you an online advertisement. This enables them to understand where you, or others who are using your computer, saw their advertisement and deliver ads that they believe are of interest to you...

Web Beacons. Web beacons are small bits of code embedded in web pages or in emails. We use web beacons to deliver or communicate with cookies, to count users who have visited a web page, and to understand usage patterns. We also include web beacons in e-mails to learn if messages have been opened, acted on, or forwarded.[1]

**B.    Defendant Falsely Informed Users That They Could Choose to Disable or "Opt-Out" from the Website's Use of Such Cookies.**

32.    When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. To learn more about cookies, including how to disable them, click on Cookie Preferences." The banner then purported to provide users the opportunity to manage their "Cookie Preferences" by selecting or clicking the link to do so, as shown in the following screenshot from the Website:



This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. To learn more about cookies, including how to disable them, click on Cookie Preferences.

Cookie Preferences            Got It

33.    Website users who clicked or selected the "Cookie Preferences" link were then directed to Defendant's "Cookie Preference Center" window, where Defendant further

---

[1] Michaels Website Privacy Statement (available at https://www.michaels.com/your-privacy-rights) (the "Privacy Statement").

CLASS ACTION COMPLAINT

represented, "Because we respect your right to privacy, you can choose not to allow some types of cookies. Click on the different category headings to find out more and change our default settings."

34.    Under the "Optional" category heading in the "Cookie Preference Center" window, Defendant further represented that "Under the California Consumer Privacy Act, you have the right to opt-out of the these [sic] cookies that collect information for analytics and to personalize your experience with targeted ads. You may exercise your right to opt out by using this toggle switch." Besides the toggle switch, Defendant also listed several categories of "Optional" cookies from which users could "opt-out," or which they could otherwise decline or reject. These were "Targeting Cookies," "Social Media Cookies," "Performance Cookies," and "Functional Cookies." The only cookies from which users could not "opt-out," or which they could not otherwise decline or reject, were the "Required" cookies necessary for the Website to function, as shown in the following screenshots:

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24
25
26



27
28

CLASS ACTION COMPLAINT



35.    Plaintiffs and other users of the Website who adjusted the toggle switch to opt out of, decline, or reject all Optional cookies, including Targeting, Social Media, Performance, and Functional cookies and clicked the "Confirm My Choices" button—thereby indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website (except those required for the Website's function)—could then continue to browse the Website, as the popup cookie consent banner and Cookie Preference Center window disappeared.

36.    Defendant's popup cookie consent banner and Cookie Preference Center window led Plaintiff, and all those Website users similarly situated, to believe that they had opted out of, declined, or rejected all cookies and tracking technologies, except those necessary for the Website's function, and especially those used to "collect information for analytics and to personalize your experience with targeted ads." The consent banner and Cookie Preference

CLASS ACTION COMPLAINT

Center window further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon adjusting the toggle switch on the Cookie Preference Center window to reject all "Optional" cookies.

37.    Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other users clicked or selected the "Cookie Preferences" link in the consent banner, then adjusted the toggle switch on the Cookie Preference Center window to opt-out of or reject all "Optional" cookies, and clicked the "Confirm My Choices" button, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website. Nevertheless, Defendant caused the Third-Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

38.    In particular, when users clicked or selected the "Cookie Preferences" link in the consent banner, then adjusted the toggle switch on the Cookie Preference Center window to opt-out of or reject all "Optional" cookies, and clicked "Confirm My Choices," Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, causing them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by opting out of or rejecting cookies, Defendant failed to prevent cookies

from being transmitted to Third Parties, causing them to track user behavior and communications.

39.    Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user clicked or selected the "Cookie Preferences" link on the Website's popup cookie consent banner, then adjusted the toggle switch on the Cookie Preference Center window to opt-out of all Optional cookies, including all Targeting, Social Media, Performance, and Functional cookies, except those Required for the Website to function, and clicked the "Confirm My Choices" button:

CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT

40.     The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.michaels.com. The screenshots depict only network traffic occurring *after* the user opted out of or rejected all Optional cookies using the toggle switch on the Cookie Preference Center window. As shown above, despite the user's choice/agreement to opt out of or reject all such cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.google.com; bat.bing.com; analytics.tiktok.com; www.facebook.com, and others. As further shown in the "Cookies" column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Website caused third-party cookie data and users' Private Communications to be transmitted to

CLASS ACTION COMPLAINT

Third Parties, even after consumers opted out of, declined, or rejected all such cookies and tracking technologies by clicking or selecting the "Cookie Preferences" link, adjusting the toggle switch on the Cookie Preference Center window, and clicking "Confirm My Choices." All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's choice/agreement to opt out of or reject all such cookies.

41.     Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

42.     As users interact with the Website, even after clicking or selecting the "Cookie Preferences" link, adjusting the toggle switch to opt out of "Optional" cookies on the Cookie Preference Center window, and clicking "Confirm My Choices," thereby declining or rejecting the use of cookies and similar technologies for personalized content, advertising, and analytics, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits

CLASS ACTION COMPLAINT

and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

43.    The Third Party code that the Website causes to be loaded and executed by the user's browser becomes a wiretap when it is executed because it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

### C.    The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendant's Website.

#### 1.    Facebook Cookies

44.    Defendants cause third party cookies to be transmitted to and from Website users' browsers and devices to and from the **facebook.com** domain, even after users elect to reject all unnecessary cookies (including Targeting, Social Media, Performance, and Functional cookies). This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[2] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

45.    The facebook.com cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance.

46.    In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies cause Meta's advertising platform to enable advertisers to

---

[2] https://www.facebook.com/privacy/policies/cookies/.

CLASS ACTION COMPLAINT

show relevant ads to those users when they visit other websites within Meta's ad network.[3] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[4]

47.    The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[5]

48.    For example, the Meta software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to the Facebook domain when a consumer views a page for a gallery-wrapped heavy duty canvas:



| Key | Value |
| --- | --- |
| cd[content_category] | %5B"MARTHA%20PAINT%2FACC"%5D |
| cd[content_ids] | 10472532 |
| cd[content_name] | %5B"Level%203%20Gallery%20Wrapped%20Heavy%20Duty%20Canvas%20by%20Artist%27s%20Loft%C2%AE"%5D |
| cd[content_type] | product |
| cd[currency] | USD |
| coo | false |
| dl | https%3A%2F%2Fwww.michaels.com%2Fproduct%2Flevel-3-gallery-wrapped-heavy-duty-canvas-by-artists-loft-10472532%3FmichaelsStore%3D6820%26inv%3D16 |
| ec | 1 |
| ev | ViewContent |
| fbp | fb.1.1679357310929.2071764988 |
| ic | fbpixel |
| id | 1629621050383130 |
| if | false |
| it | 1679358106928 |

[3] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect

[4] https://allaboutcookies.org/what-data-does-facebook-collect.

[5] *Id.*

CLASS ACTION COMPLAINT



49.     Along with this data, cookie data is sent to the Facebook domain. For example:

50.     The c_user cookie shown above causes Facebook to identify a specific user when they are logged in to their account. The c_user cookie stores a user's unique ID, which is associated with their Facebook profile. This ID causes Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

CLASS ACTION COMPLAINT

51.    Defendant also causes the consumer's user-agent and IP address to be sent to Facebook, after the consumer rejects cookies, which can, among other things, allow Facebook to know that a user is located in California.

52.    By identifying users who have shown interest in certain products or content, the facebook.com cookies cause Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[6] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[7]

53.    The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses), including whether the user is located in California.[8]

54.    Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics (such as females, Millennials, Californians, etc.),

---

[6] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect

[7] https://allaboutcookies.org/what-data-does-facebook-collect.

[8] *Id.*

CLASS ACTION COMPLAINT

interests and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

### 2.    Google Cookies

55.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users reject all unnecessary cookies (including all Targeting, Social Media, Performance, and Functional cookies) to and from the **www.google.com** and **doubleclick.net** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[9] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[10] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[11]

---

[9] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[10] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[11] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

CLASS ACTION COMPLAINT

56.    Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[12] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

57.    Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[13] "To measure a website . . . [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect . . . information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[14]

58.    Google's cookies allow it to obtain and store at least the following user data: (i) browsing   history,   (ii) visit   history,   (iii) website   interactions,   (iv) user   input   data,

---

[12] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[13] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

**[14]** Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

CLASS ACTION COMPLAINT

(v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[15]

59.    For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's advertising domain, at googleads.g.doubleclick.net:



| Request | Header | Query | Body | Cookies | Raw | Summary | + |

| Key | Value |
| --- | --- |
| async | 1 |
| auid | 1496129281.1679357311 |
| bg | ffffff |
| crd | |
| ct_cookie_present | false |
| ctc_id | CAIVAgAAAB0CAAAA |
| currency_code | usd |
| cv | 11 |
| eitems | ChEl8ljgoAYQz_3O4u3ihbijARIdAO7zENt-UwktPuBltPqffb80dMQFJuOrsp_EyDl |
| fmt | 3 |
| frm | 0 |
| fst | 1679358106758 |
| gtm | 45He33f0 |
| guid | ON |
| hn | www.googleadservices.com |
| label | guNICMHj6ZkDEJeOs8gD |
| ocp_id | mvgYZLfYMqWO9AOw7ZyABw |

---

[15] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

CLASS ACTION COMPLAINT

| | |
|---|---|
| pscrd | Ek5DaEFJOEIqZ29BWVFfcVh5b0pHSmw4OG1FaVlBQmloLVRNQU9PdGhlYTJrROJiMTNGNFlXWXpwUjU1RE9UZGlxTk05R3RqNmtmMExXOUEaWkNoRUk4SWpnb0FZUV90ZUMwYTNmOVplYUFSSXVBBslM4ZjdLMk44QWFoZk9QbXhhclIldUVuZWRDdjE2MGRJWGE2UjZENHV2Qms3clIYX3ViM1c2dnRXM05UZw |
| random | 222272748 |
| ref | https://www.michaels.com/shop/art-supplies/artist-canvas/stretched-canvas?page=1&facetFilters%5B0%5D%5BfacetKey%5D=artistLevel&facetFilters%5B0%5D%5BfacetValue%5D%5B0%5D=Academic%20Level&facetFilters%5B0%5D%5BfacetValue%5D%5B1%5D=Artist%20Level&facetFilters%5B0%5D%5BfacetValue%5D%5B2%5D=Professional%20Level |
| sscte | 1 |
| tiba | Level 3 Gallery Wrapped Heavy Duty Canvas by Artist's Loft® | Stretched Canvas | Michaels |
| u_h | 1260 |
| u_w | 2240 |
| url | https://www.michaels.com/product/level-3-gallery-wrapped-heavy-duty-canvas-by-artists-loft-10472532?michaelsStore=6820&inv=16 |
| value | 0 |

60.    Along with this data, cookie data is sent to Google. For example:

| Request  Header  Query  Body  Cookies  Raw | Summary  + |
|---|---|
| **Key** | **Value** |
| DSID | AGJ6mWIHbbexxCzmseMgF5g00SFma74drYwn8tTQyczw9Uo8QNqeLBV-o7QVzMOu1Jhg-T1h5yxp4sL0nmL4K6KSMqQxQsgRNhINDdymE_qqpy3F41rPa23h6JRo9IeJIPNBD7ebDMLJQqxz7GA7W2xBR-lkxL4ZRYhLCrB4JnGjLu-5-i2m5YilkcTLqpnb2FZwc_cCFcQpF8ix5QItrxs4_MIfKURQ8Qkk0y8tHZCljuE6-8vFfsiPSzDHwrlniCbSJ-QdVniA3aopTV_6m5wYu51mdQDIfetCnVrfKCSjVqWWuM3xRek |
| IDE | AHWqTUlisx_isZELzBGZY-dY0PXdERAYbLBv8ETeQcMDK-vVCmwmn1ciyq1dc8oPLGM |

61.    According to Google, the "IDE" cookie is an "advertising" cookie, used to show Google ads on non-Google sites," and "to personalize the ads you see."[16]

_____

[16] https://policies.google.com/technologies/cookies?hl=en-US. *See also* https://business.safety.google/adscookies/

62.    Google uses the "DSID" cookie to "identify a signed-in user on non-Google sites."[17] The "IDE" cookie is used "to personalize the ads [users] see" and "to show Google ads on non-Google sites."[18]

63.    The data sent to Google also includes the "user-agent," which causes Google to determine the user's operating system and browser.

64.    Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

65.    Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

66.    Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build

---

[17] *See* https://policies.google.com/technologies/cookies?hl=en-US
[18] *Id.*

leads and sales by bringing previous visitors back to your website to complete what they started."[19]

67.     Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[20] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

### 3.    TikTok Cookies

68.     Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to reject all unnecessary cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd., known for short-form video sharing. [21] The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[22]

---

[19] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

[20] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[21] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[22] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

69.     TikTok utilizes analytics.tiktok.com cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[23] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies cause TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate TikTok user behavior.

70.     These cookies cause TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[24]

71.     For example, the TikTok software code that Defendant causes to be stored on and executed by the Website user's device causes the following type of data to be sent to TikTok's domain, at analytics.tiktok.com:

---

[23] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[24] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

| POST | 200 | https://analytics.tiktok.com/api/v2/pixel |

**Request** Header Query **Body** Cookies Raw Summary +          Tree View ⌄

| Key | Value |
| --- | --- |
| ⌄ Root | Object(8 items) |
| event | Pageview |
| message_id | messageId-1679358107576-2629572926221-C20... |
| ⌄ context | Object(10 items) |
| ⌄ device | Object(1 items) |
| platform | pc |
| ⌄ library | Object(2 items) |
| name | pixel.js |
| version | legacy-2.1.33 |
| variation_id | test_3 |
| ⌄ pixel | Object(1 items) |
| code | C20PORA6P62B4G5GRL9G |
| ⌄ ad | Object(2 items) |
| sdk_env | external |
| jsb_status | 2 |
| session_id | 83203379-c77c-11ed-ab7b-b8cef6a297a8::xriKW3j... |
| pageview_id | pageId-1679358107569-3099787049809-C20POR... |
| userAgent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) App... |
| ⌄ page | Object(2 items) |
| url | https://www.michaels.com/product/level-3-gallery-wr... |
| referrer | https://www.michaels.com/shop/art-supplies/artist-ca... |
| ⌄ user | Object(1 items) |
| anonymous_id | Q2cp_tkQ21W6sfWpy7jJgGWsE5Y |
| event_id | |
| is_onsite | false |
| properties | Object(0 items) |
| timestamp | 2023-03-21T00:21:47.576Z |
| _inspection | Object(0 items) |

72.    The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[25]

73.    Along with this data, defendant also causes cookie data to be sent to TikTok. For example:



| POST | 200 | https://analytics.tiktok.com/api/v2/pixel |

**Request** Header Query Body **Cookies** Raw Summary +

| Key | Value |
| --- | --- |
| _ttp | 2MenoiR91HAhtcre3LuM4VzeN48 |
| ttwid | 1%7CNSVAg_42CPD2-SYV-TbojC56c4eqRolk0u5QsppU1M0%7C1678147699%7C53e932cd72e88d63aac7c2695404518261c9d55683581929437a4d1c55171930 |

---

[25] See, e.g., *How to get TikTok session id?* (available at https://gbtimes.com/how-to-get-tiktok-session-id/)

74.     According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[26]

75.     According to TikTok's documentation, "[t]he 'ttwid' first-party cookie is for analytics and web optimisation."[27]

76.     Finally, the data sent to TikTok includes the user's user-agent and IP address.

77.     By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[28]

78.     Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. Tiktok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[29]

### 4.     Adobe Cookies

79.     Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to reject all unnecessary cookies, to and from

---

[26] *See TikTok for Business: Using Cookies with TikTok Pixel* (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en)

[27] https://www.tiktok.com/legal/page/global/tiktok-website-cookies-policy/en

[28] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[29] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

CLASS ACTION COMPLAINT

the **demdex.net** domain. This domain is associated with Adobe Inc.'s Audience Manager, a data management platform, Adobe's Marketing Cloud, and Adobe's Experience Cloud Identity Service, a service which provides a universal, persistent ID to identify visitors across all Adobe products.

80.    These cookies are used to assign a unique identifier to each site visitor, which causes Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and evaluate user behavior online.[30] These cookies cause Adobe to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[31]

81.    Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics, create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[32]

82.    For example, the Adobe software code that Defendant causes to be stored on and executed by the Website user's device causes tracking cookies to be sent to Adobe's domain, at dpm.demdex.net:

---

[30] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).

[31] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).

[32] *See, e.g.,* Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

CLASS ACTION COMPLAINT

83.    Finally, the data sent to Adobe includes the user's user-agent and IP address.

### 5.    Microsoft Bing Cookies

84.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to reject all unnecessary cookies, to and from the **<u>bat.bing.com</u>** domain. "The webpage bat.bing.com is a host for Bing Ads Conversion tracking code. This webpage is owned by Microsoft[.]"[33] The domain is associated with Bing, Microsoft's search engine, as well as Microsoft's digital advertising and analytics platforms. When a webpage loads a bat.bing.com cookie, it "tells Microsoft Advertising about the user visits to [the] webpage."[34] Microsoft uses bat.bing.com cookies to "record[] what customers do on [a] website and send[] that information to Microsoft Advertising." [35] Microsoft then serves targeted ads to web users across its extensive ad networks, which utilizes its "rich" supply of gathered data to "reach more than a billion people[.]"[36]

85.    Bat.bing.com cookies collect consumers' (i) search history and browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information

---

[33] https://answers.microsoft.com/en-us/msadvs/forum/all/does-batbing-track-your-browser-searches-and-sites/0a402f00-60c2-4d54-bd7d-81b67ccc7f13.

[34]https://help.ads.microsoft.com/apex/index/3/en/56959#:~:text=The%20most%20important%20request%20is,making%20when%20your%20webpage%20loads.

[35] https://help.ads.microsoft.com/#apex/ads/en/56960/1.

[36] https://answers.microsoft.com/en-us/msadvs/forum/all/opt-out-of-audience-ads/753bc0fc-c04f-4e20-a94a-abaa950ccf31#:~:text=When%20you%20come%20to%20Microsoft,and%20rich%20first%2Dparty%20data.

CLASS ACTION COMPLAINT

(including zip code[37]; gender[38]; age[39] (including identifying whether that person is a minor or not)); (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses). Bat.bing.com updates this information each time a user clicks on a website hosting a third-party bat.bing.com cookie. Bat.bing.com keeps this user data for six months.

86.    Bat.bing.com cookies help Microsoft track users' interactions with ads (e.g., clicking a link or making a purchase) and provide valuable metrics that advertisers use to measure ad campaign performance. Further, bat.bing.com cookies allow Microsoft to obtain and store at user data to "help [website owners] focus a campaign or ad group on potential audiences who meet [website owners'] specific criteria, so [website owners] can increase the chance that [consumers] see [website owners'] ads."[40] Further, bat.bing.com offers [website owners] valuable "conversion tracking," which is a "measure [of] the ROI (return on investment) of your advertising campaign by letting [website owners] assign a monetary value to the activities people complete on [Defendant's] website after clicking [website owners'] ad."[41]

87.    To that end, Defendant causes cookie and other data to be sent to Microsoft Bing, including the following types of tracking cookies and tracking data:

---

[37] https://help.ads.microsoft.com/#apex/ads/en/60212/0.

[38] *Id.*

[39] *Id.*

[40] https://help.ads.microsoft.com/#apex/ads/en/60212/0.

[41] https://help.ads.microsoft.com/#apex/ads/en/56680/2.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



88.     According to Microsoft's documentation, the "MUID" cookie "[i]dentifies unique web browsers visiting Microsoft sites [and is] used for advertising, site analytics, and other operational purposes."[42]

89.     The data sent to Microsoft includes the user's user-agent and IP address

_____

[42] https://learn.microsoft.com/en-us/clarity/setup-and-installation/cookie-list.

CLASS ACTION COMPLAINT

90.     Microsoft also utilizes bat.bing.com data for its own purposes, including by using the data to tailor content and target advertisements to users. This profile causes Microsoft to deliver highly targeted ads within Microsoft's extensive advertising network. Microsoft's revenue from its advertising network program has exceeded $10 billion as of 2022.[43]

### 6.     LiveRamp Cookies

91.     Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users opt-out of all unnecessary cookies, to and from the **pippio.com** domain.[44] This domain is associated with LiveRamp, a software company that allows businesses to combine customer data from various online and offline sources and leverage that data for marketing and analytics purposes.[45] Pippio.com cookies are used to create an online identification code for the purpose of recognizing users' devices and tracking their user behavior.

92.     These cookies cause LiveRamp to obtain and store at least the following user data: browsing history, visit history, website interactions, user input data (such as email address), demographic information, interests and preferences, device information, user identifiers, and geolocation data (including IP addresses), on the Websites. The unique user identifier enables LiveRamp to sell a user's unique data for use in online and cross-channel advertising (including targeted advertising and email marketing).

93.     LiveRamp explains in its Privacy Notice the user data it receives from pippio cookies installed on "partner websites" and how it uses (and monetizes) that data as follows:

> [The website] partner may sell or share personal information collected from you, such as your email, cookies set on your browser, IP address, or information about your browser or operating system, with LiveRamp. LiveRamp uses this information to create an online identification code for the purpose of recognizing your device. This code may be placed in our partners' cookie and for use in online and cross-channel advertising (including targeted advertising and email marketing), or LiveRamp may connect it to LiveRamp's own 3rd-party cookie and other identifiers. In addition, by associating an email address

---

[43] https://digiday.com/media/microsofts-ad-revenue-hit-10b-and-its-investing-is-a-sleeping-giant-about-to-wake/.

[44] *See* LiveRamp Product and Service Privacy Notice (available at https://liveramp.com/privacy/service-privacy-policy/).

[45] See https://liveramp.com/privacy/service-privacy-policy/#section1a; *see also* LiveRamp Data Marketplace (available at https://liveramp.com/data-marketplace/).

with a cookie, LiveRamp and third parties can link your browsing activity across different websites and other applications and services to your specific device associated with the email address, identifying the user behind the device. This means that, even when browsing unrelated sites, your online activity can be connected to you for advertising and other marketing-related purposes, including email marketing and offline advertising...

The personal data and identifiers we collect (for instance, a cookie ID) may be linked to other personal data and identifiers through known associations and/or identity resolution (for instance, an identifier derived from or associated with a hashed email address and LiveRamp cookie 1234 might be associated with partner cookie 5678), and shared with advertising partners and other third party advertising companies for the purpose of enabling interest-based content or targeted advertising throughout your online and offline experiences (e.g., web, TV [MVPDs], connected TV, mobile applications, email marketing and other media). These third parties may in turn use this identifier to link demographic or interest-based information you have provided in your interactions with them. Note that LiveRamp does not itself provide the service of targeted advertising (sometimes referred to as "cross-context advertising") but, rather, processes and transfers data to an advertiser's advertising platform so that platform can provide targeted advertising services...[46]

### 7. Additional Third Party Cookies

94. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to opt out of or reject all unnecessary cookies, to and from other domains, including insight.adsrvr.org; yahoo.com; ib.adnxs.com; pubmatic.com; pinterest.comtr.snapchat.com; gum.criteo.com, among others.

95. The **insight.adsrvr.org** domain is associated with The Trade Desk, Inc., a digital advertising company that offers a cloud-based ad-buying platform that enables businesses to plan, manage, optimize, and measure data-driven digital advertising campaigns.[47] The Trade Desk uses insight.adsrvr.org cookies to collect data on users such as their geographic locations, the type of device users are using, and users' interests as inferred from their web browsing or app usage activity."[48] This data helps The Trade Desk personalize ad content and track users across the internet.[49]

---

[46] *Id.*

[47] *See* The Trade Desk, Inc. 2023 Form 10-K (filed February, 15 2024).

[48] *Id.*

[49] *Id.*

96.    The Trade Desk acknowledges that its cookies' ability "to collect, augment, analyze, use and share data relies upon the ability to uniquely identify devices across websites and applications, and to collect data about user interactions with those devices for purposes such as serving relevant ads and measuring the effectiveness of ads."[50]

97.    The **yahoo.com** domain is owned by Yahoo Inc., a technology company that focuses on online media and advertising. Cookies set by the yahoo.com domain are used to target website users with advertising by assigning Website users unique identifiers.[51] These cookies collect information, such as IP addresses, browser type and settings, operating system, device type, and advertising identifiers from other third parties, including Apple's ID for Advertising, Apple's ID for vendors, Google's Android ID, and Google's Play Store Ad ID.[52] Cookies are further used to support Yahoo's targeting of content and advertising and to associate users, devices, and accounts with each other or with those in a similar location, such as in the same household.[53] Yahoo's use of a unique identifier with its cookies allows it to track users across the internet and across different devices.[54] The purpose of Yahoo Inc.'s cookies and the data they collect is to track users and target them with advertisements—the sale of which Yahoo uses to generate revenues.

98.    The **ib.adnxs.com** domain is associated with AppNexus, owned by Microsoft. Microsoft uses adnxs.com cookies to collect data on user navigation and behavior on websites, including information on user preferences and/or interaction with web-campaign content, to target advertisements.[55] The cookies include unique identifiers that help Microsoft recognize

---

[50] *Id.*

[51] https://cookiepedia.co.uk/host/yahoo.com

[52] https://legal.yahoo.com/us/en/yahoo/privacy/topics/
cookies/index.html#:~:text=When%20you%20log%20in%20to,or%20device%20you%20are%20using.

[53] *Id.*

[54] *Id.*

[55] https://cookiepedia.co.uk/host/adnxs.com

CLASS ACTION COMPLAINT

users across different websites and sessions.[56] This allows cookies set from the adnxs.com domain to collect data, including IP address, user demographic information, geographic location, page views, and interactions with websites.[57] These cookies also enable Household Attribution, a feature that enables Microsoft to match ads served on any device to website activity occurring on any device connected to the same network using the same IP address.[58] Further, the cookies enable advertisers to track the effectiveness of campaigns and avoid showing the same ads repeatedly to the same users. Microsoft uses this data to personalize ad content and track users across the internet. Adnxs.com cookies also categorize users into different segments based on their interests, demographics, or behaviors. This segmentation is used to target specific audiences with tailored ads. The data collected by cookies set through the adnxs.com domain has allowed Microsoft to set up a platform in which advertisers can bid for and place advertisements targeted at users based on a variety of demographics, including, among other things, demography, device type, and location.[59]

99.    The **pubmatic.com** domain (and its subdomains) is associated with PubMatic, Inc., a digital advertising company.[60] PubMatic uses pubmatic.com cookies to collect data on user behavior on websites including user interactions with advertising content.[61] PubMatic uses this data to personalize advertising content and track users across the internet.[62]

---

[56] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json

[57] *Id.*; https://www.microsoft.com/en-us/privacy/privacystatement#mainpersonaldatawecollectmodule

[58] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json

[59] https://learn.microsoft.com/en-us/xandr/monetize/buy-side-targeting#other-targeting-guidance

[60] *See* www.metrixlab.com.

[61] *See*, PubMatic, Inc. Form 10-K for year ending December 31, 2023 (Filed February 28, 2024) at 17–18.

[62] *Id.*

CLASS ACTION COMPLAINT

1    100.    The **pinterest.com** domain is associated with Pinterest, Inc., a popular social

2    media platform that allows users to discover, save, and share ideas as pins in the form of photos

3    and videos. Businesses can upload and showcase their products through "Shop the Look" pins

4    or Product Pins that directly link to e-commerce websites. Businesses install the Pinterest tag on

5    their websites to track ad conversions. As Pinterest explains, "The Pinterest tag is a piece of code

6    that you add to your website. It lets Pinterest track visitors to your site, as well as the actions

7    they take on your site after seeing your Pinterest ad. This means you can measure how effective

8    your Pinterest ads are by understanding the actions people take on your website after seeing or

9    engaging with your ad."[63] Pinterest cookies can be used to identify and track people who

10   purchase products, add items to a shopping cart, visit specific pages on the website, and/or search

11   for specific items on the website.[64]

12   101.    The subdomain **tr.snapchat.com** is associated with Snap Inc. (SnapChat), a

13   social media company that uses its cookies to measure users' conduct across distinct websites to

14   help advertisers target ads.[65] SnapChat uses tr.snapchat.com to collect data on browsing history,

15   choices, and interactions with advertisements.[66] This data helps Snapchat personalize ad content

16   and track users across the internet.[67]

17   102.    The **criteo.com** domain is associated with Criteo S.A., a digital advertising

18   company that provides online advertisements.[68] Criteo S.A. uses cookies set with the criteo.com

19   domain to build a unique profile for each website user and to target those users with

20   advertisements.[69] Cookies set with the Criteo.com domain assign a unique identifier to users'

---

[63] Pinterest Help Center: Install the Pinterest Tag (available at https://help.pinterest.com/en/business/article/install-the-pinterest-tag).

[64] *See, e.g.*, Pinterest Help Center: Add event codes (available at https://help.pinterest.com/en/business/article/add-event-codes); Pinterest Help Center: View tag parameters and cookies (available at https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies).

[65] *See* https://snapdiscoveries.com/what-is-tr-snapchat-com-is-used-for.

[66] *Id.*

[67] *Id.*

[68] *See* https://www.criteo.com/platform/commerce-media-platform/.

[69] https://www.criteo.com/advertising-guidelines/.

CLASS ACTION COMPLAINT

browsers and devices, and collect data on user's pages views, behavior on websites, information on user preferences and/or interaction with advertisements, and products users have viewed, put in their digital shopping carts, and/or purchased.[70] Criteo S.A. uses this data to personalize ad content and track users across the internet to, among other things, target, price, place, and schedule advertisements.[71]

103.    These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data.

**D.    The Private Communications Collected are Valuable.**

104.    As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

105.    The Private Communications that the Third Parties track and collect by way of the cookies on the Website is valuable to Defendant as well as the Third Parties. Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its arts and crafts or home décor products to California consumers, Defendant could use the data collected by the Third Parties to monitor the location of users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendant

---

[70] Id.; https://cookiepedia.co.uk/cookies/criteo.

[71] *Id.*

CLASS ACTION COMPLAINT

to target online advertisements to users when they visit *other* websites, even those completely unrelated to Defendant and its products.

106.    Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's arts and crafts or home décor products. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brands and across the arts and crafts or home décor markets. All of this helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

107.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[72] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

108.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

109.    Through its false representations and aiding, agreeing with, employing, permitting, or otherwise causing the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Thomas Simmons**

110.    Plaintiff Simmons visited the Website to seek information about Defendant's products, while located in California, on one or more occasions during the last four years.

---

[72] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

111.    Plaintiff Simmons' visits to the Website were consistent with a typical Website user's visits seeking information about Michael's products. Specifically, Plaintiff Simmons is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

112.    When Plaintiff Simmons visited the Website, the Website detected that he was a visitor in California and immediately presented him with Defendant's popup cookie consent banner, which provided the option to click or select the "Cookie Preferences" link. Plaintiff Simmons viewed Defendant's representation on the popup cookie consent banner that, "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners." Plaintiff Simmons also viewed Defendant's additional representation that, "To learn more about cookies, including how to disable them, click on Cookie Preferences."

113.    Consistent with his typical practice in disabling cookies or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Simmons selected and clicked the "Cookie Preferences" link. The Website then presented Plaintiff Simmons with Defendant's Cookie Preference Center window. There, Plaintiff Simmons saw Defendant's additional representations that (i) "Because we respect your right to privacy, you can choose not to allow some types of cookies. Click on the different category headings to find out more and change our default settings." and (ii) "Under the California Consumer Privacy Act, you have the right to opt-out of the these [sic] cookies that collect information for analytics and to personalize your experience with targeted ads. You may exercise your right to opt out by using this toggle switch." Plaintiff Simmons saw the accompanying toggle switch and saw that Defendant also listed several categories of "Optional" cookies from which users could "opt-out," or which they could otherwise decline or reject. These were "Targeting Cookies," "Social Media Cookies," "Performance Cookies," and "Functional Cookies." The only cookies from which Plaintiff Simmons could not "opt-out," or which he could not otherwise decline or reject, were the "Required" cookies necessary for the Website to function.

114.    Plaintiff Simmons adjusted the "Optional" toggle switch on the Cookie Preference Center window and clicked "Confirm My Choices". Plaintiff Simmons believed doing so would allow him to opt out of, decline, and/or reject all Optional cookies, including all Targeting, Social Media, Performance, and Functional cookies, except Required cookies necessary for the Website to function. Plaintiff Simmons also believed that adjusting the toggle switch and clicking "Confirm My Choices" would also allow him to opt out of, decline, and/or reject other tracking technologies, inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, targeted advertising, and analytics.

115.    In selecting the "Cookie Preferences" link, adjusting the toggle switch found on the "Cookie Preference Center" window, and clicking "Confirm My Choices," Plaintiff Simmons gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Simmons specifically rejected, based on Defendant's representations, those cookies used to "collect information for analytics and to personalize your experience with targeted ads" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Simmons continue browsing the Website.

116.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, targeted advertising, analytics, and social media, to be placed on Plaintiff Simmons's device and/or transmitted to the Third Parties along with user data, without Plaintiff Simmons's knowledge. Accordingly, the representations found on the popup cookies consent banner and Cookie Preference Center window to Plaintiff Simmons that he could choose not to allow, opt out of or reject the use and/or placement of all unnecessary cookies and tracking technologies while he browsed the Website were false. Contrary to what Defendant made Plaintiff Simmons believe, he did not have a choice about whether third-party cookies would be placed on his device

1    and/or transmitted to the Third Parties along with his user data; rather, Defendant had already

2    caused that to happen.

3        117.    Then, as Plaintiff Simmons continued to browse the Website in reliance on the

4    promises Defendant made in the cookie consent banner, and despite Plaintiff Simmons' clear

5    rejection of the use and/or placement of such cookies and tracking technologies, Defendant

6    nonetheless continued to cause the placement and/or transmission of cookies along with user

7    data, including those involved in providing personalized content, targeted advertising, analytics,

8    and social media content from the Third Parties on his device. In doing so, Defendant permitted

9    the Third Parties to track and collect Plaintiff Simmons' Private Communications as he browsed

10   the Website.

11       118.    Defendant's representations that consumers could "choose not to allow some

12   types of cookies" and "opt-out of the…cookies that collect information for analytics and to

13   personalize your experience with targeted ads" while Plaintiff Simmons and users browsed the

14   Website, or at least all Optional cookies, including all Targeting, Social Media, Performance,

15   and Functional cookies, were untrue. Had Plaintiff Simmons known this fact, he would not have

16   used the Website. Moreover, Plaintiff Simmons reviewed the popup cookie consent banner and

17   Cookie Preference Center window prior to using the Website. Had Defendant disclosed that it

18   would continue to cause cookies and tracking technologies to be stored on consumers' devices

19   even after they choose to opt out of or reject all unnecessary cookies, Plaintiff Simmons would

20   have noticed it and would not have used the Website or, at a minimum, he would have interacted

21   with the Website differently.

22       119.    Plaintiff Simmons continues to desire to browse content featured on the Website.

23   Plaintiff Simmons would like to browse websites that do not misrepresent that users can opt out

24   of or reject all unnecessary cookies and tracking technologies. If the Website were programmed

25   to honor users' requests to opt out of or reject all unnecessary cookies and tracking technologies,

26   Plaintiff Simmons would likely browse the Website again in the future, but he will not do so

27   until then. Plaintiff Simmons regularly visits websites that feature content similar to that of the

28

Website. Because Plaintiff Simmons does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to opt out of or reject all unnecessary cookies and tracking technologies, Plaintiff Simmons will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Simmons is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Sonni Echeverria-Corzan**

120.    Plaintiff Echeverria-Corzan visited the Website to browse information about Defendant's products, while located in California, on one or more occasions during the last four years.

121.    Plaintiff Echeverria-Corzan visits to the Website were consistent with a typical Website user's visits seeking information about Michael's products. Specifically, Plaintiff Echeverria-Corzan is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

122.    When Plaintiff Echeverria-Corzan visited the Website, the Website detected that she was a visitor in California and immediately presented her with Defendant's popup cookie consent banner, which provided the option to click or select the "Cookie Preferences" link. Plaintiff Echeverria-Corzan viewed Defendant's representation on the popup cookie consent banner that, "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners." Plaintiff Echeverria-Corzan also viewed Defendant's

CLASS ACTION COMPLAINT

additional representation that, "To learn more about cookies, including how to disable them, click on Cookie Preferences."

123.    Consistent with her typical practice in disabling cookies or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Echeverria-Corzan selected and clicked the "Cookie Preferences" link. The Website then presented Plaintiff Echeverria-Corzan with Defendant's Cookie Preference Center window. There, Plaintiff Echeverria-Corzan saw Defendant's additional representations that (i) "Because we respect your right to privacy, you can choose not to allow some types of cookies. Click on the different category headings to find out more and change our default settings." and (ii) "Under the California Consumer Privacy Act, you have the right to opt-out of the these [sic] cookies that collect information for analytics and to personalize your experience with targeted ads. You may exercise your right to opt out by using this toggle switch." Plaintiff Echeverria-Corzan saw the accompanying toggle switch and saw that Defendant also listed several categories of "Optional" cookies from which users could "opt-out," or which they could otherwise decline or reject. These were "Targeting Cookies," "Social Media Cookies," "Performance Cookies," and "Functional Cookies." The only cookies from which Plaintiff Echeverria-Corzan could not "opt-out," or which she could not otherwise decline or reject, were the "Required" cookies necessary for the Website to function.

124.    Plaintiff Echeverria-Corzan adjusted the "Optional" toggle switch on the Cookie Preference Center window and clicked "Confirm My Choices." Plaintiff Echeverria-Corzan believed doing so would allow her to opt out of, decline, and/or reject all Optional cookies, including all Targeting, Social Media, Performance, and Functional cookies, except Required cookies necessary for the Website to function. Plaintiff Echeverria-Corzan also believed that adjusting the toggle switch and clicking "Confirm My Choices" would also allow her to opt out of, decline, and/or reject other tracking technologies, inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, targeted advertising, and analytics.

CLASS ACTION COMPLAINT

125.    In selecting the "Cookie Preferences" link, adjusting the toggle switch found on the "Cookie Preference Center" window, and clicking "Confirm My Choices," Plaintiff Echeverria-Corzan gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Echeverria-Corzan specifically rejected, based on Defendant's representations, those cookies used to "collect information for analytics and to personalize your experience with targeted ads" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Echeverria-Corzan continue browsing the Website.

126.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, targeted advertising, analytics, and social media, to be placed on Plaintiff Echeverria-Corzan's device and/or transmitted to the Third Parties along with user data, without Plaintiff Echeverria-Corzan's knowledge. Accordingly, the representations found on the popup cookies consent banner and Cookie Preference Center window to Plaintiff Echeverria-Corzan that she could choose not to allow, opt out of or reject the use and/or placement of all unnecessary cookies and tracking technologies while she browsed the Website were false. Contrary to what Defendant made Plaintiff Echeverria-Corzan believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

127.    Then, as Plaintiff Echeverria-Corzan continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Echeverria-Corzan's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, targeted advertising, analytics, and social media content from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Echeverria-Corzan's Private Communications as Plaintiff Echeverria-Corzan browsed the Website.

128.    Defendant's representations that consumers could "choose not to allow some types of cookies" and "opt-out of the…cookies that collect information for analytics and to personalize your experience with targeted ads" while Plaintiff Echeverria-Corzan and users browsed the Website, or at least all Optional cookies, including all Targeting, Social Media, Performance, and Functional cookies, were untrue. Had Plaintiff Echeverria-Corzan known this fact, she would not have used the Website. Moreover, Plaintiff Echeverria-Corzan reviewed the popup cookie consent banner and Cookie Preference Center window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to opt out of or reject all unnecessary cookies, Plaintiff Echeverria-Corzan would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

129.    Plaintiff Echeverria-Corzan continues to desire to browse content featured on the Website. Plaintiff Echeverria-Corzan would like to browse websites that do not misrepresent that users can opt out of or reject all unnecessary cookies and tracking technologies. If the Website were programmed to honor users' requests to opt out of or reject all unnecessary cookies and tracking technologies, Plaintiff Echeverria-Corzan would likely browse the Website again in the future, but she will not do so until then. Plaintiff Echeverria-Corzan regularly visits websites that feature content similar to that of the Website. Because Plaintiff Echeverria-Corzan does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to opt out of or reject all unnecessary cookies and tracking technologies, Plaintiff Echeverria-Corzan will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is

being sent to whom. Plaintiff Echeverria-Corzan is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

130.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who, while in the State of California, browsed the Website after selecting or clicking the "Cookie Preferences" link in the popup cookies consent banner, then adjusted the toggle switch on the Cookie Preference Center window to opt-out of or reject all Optional or unnecessary cookies on the Website, and clicked the "Confirm My Choices" button.

131.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

132.    **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

133.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to opt out of or reject all unnecessary cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

134.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.    Whether Defendant's actions violate California laws invoked herein; and

b.    Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

135.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, opted out of or rejected unnecessary cookies, and had their confidential Private Communications intercepted by the Third Parties.

136.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

137.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to

which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

138.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

139.    To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

140.    Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

141.    Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "choose not to allow some types of cookies" and "opt-out of the…cookies that collect information for analytics and to personalize your experience with targeted ads" and tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to

access the Website and, when presented with the popup cookies consent banner and Cookie Preference Center window on the Website, Plaintiffs and Class members opted out of or rejected unnecessary cookies and reasonably expected that their choice/agreement to opt out of or reject unnecessary cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they opted out of or rejected such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

142.    Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

143.    Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. The data that Defendant allowed third parties to collect enables the Third Parties to (and they do in fact), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain.

The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

144.    Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

145.    Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

146.    Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

147.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

148.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

149.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' choice/agreement to opt out of or reject the Website's use of

unnecessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Second Cause of Action</u>: Intrusion Upon Seclusion**

150.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

151.    To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

152.    By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

153.    The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose disable, not allow, or opt out of Optional cookies, including Targeting, Social Media, Performance, and Functional cookies, except the Required cookies necessary for the Website to function.

154.    Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could opt out of or reject all Optional cookies, including all Targeting, Social Media, Performance, and Functional cookies, except the Required cookies necessary for the

1    Website to function, as well as state criminal and civil laws designed to protect individual

2    privacy.

3          155.    Defendant's intentional intrusion into Plaintiffs' and other users' Private

4    Communications would be highly offensive to a reasonable person given that Defendant

5    represented that Website users could opt out of or reject all Optional cookies, including

6    Targeting, Social Media, Performance, and Functional cookies, except the Required cookies

7    necessary for the Website to function, when, in fact, Defendant caused such third-party cookies

8    to be stored on consumers' devices and browsers, and to be transmitted to third parties, even

9    when consumers opted out of or rejected all such cookies. Indeed, Plaintiffs and Class members

10   reasonably expected, based on Defendant's false representations, that when they opted out of or

11   rejected all unnecessary cookies and tracking technologies, Defendant would not cause such

12   third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private

13   Communications on the Website, including their browsing history, visit history, website

14   interactions, user input data, demographic information, interests and preferences, shopping

15   behaviors, device information, referring URLs, session information, user identifiers, and/or

16   geolocation data.

17         156.    Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private

18   Communications on the Website.

19         157.    Plaintiffs and Class members have been damaged by Defendant's invasion of

20   their privacy and are entitled to just compensation, including monetary damages.

21         158.    Plaintiffs and Class members seeks appropriate relief for that injury, including

22   but not limited to, damages that will compensate them for the harm to their privacy interests as

23   well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs'

24   and Class members' privacy.

25         159.    Plaintiffs and Class members seek punitive damages because Defendant's

26   actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and

27   Class members and made in conscious disregard of Plaintiffs' and Class members' rights and

28

Plaintiffs' and Class members' rejection of the Website's use of unnecessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

160.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

161.    California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

162.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

163.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360–61 (emphasis supplied; internal citations omitted).

164.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192–93 (1978). Thus, to establish liability

under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did *any* of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

165.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

166.    Defendant is a "person" within the meaning of California Penal Code § 631.

167.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

168.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties— constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

CLASS ACTION COMPLAINT

1    169.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-

2  service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D.

3  Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for

4  their own purposes and, as alleged above, they did in fact use the wiretapped information for

5  their own business purposes. Accordingly, the Third Parties were third parties to any

6  communication between Plaintiffs and Class members, on the one hand, and Defendant, on the

7  other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal.

8  2023).

9    170.    Under § 631(a), Defendant must show it had the consent of all parties to a

10  communication.

11    171.    At all relevant times, the Website caused Plaintiffs and Class members' browsers

12  to store the Third Parties' cookies and to transmit those cookies alongside Private

13  Communications—including their browsing history, visit history, website interactions, user

14  input data, demographic information, interests and preferences, shopping behaviors, device

15  information, referring URLs, session information, user identifiers, and/or geolocation data—to

16  the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in

17  this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused

18  the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to

19  accomplish the wrongful conduct alleged herein.

20    172.    At all relevant times, by their cookies and corresponding software code, the Third

21  Parties willfully and without the consent of all parties to the communication, or in any

22  unauthorized manner, read, attempted to read, and/or learned the contents or meaning of

23  electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on

24  the other, while the electronic communications were in transit or were being sent from or

25  received at any place within California.

26    173.    The Private Communications of Plaintiffs and Class members, on the one hand,

27  and Defendant, on the other, that the Third Parties automatically intercepted directly

28

communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

174.    At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

175.    Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise causing the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to opt out of or reject all unnecessary cookies in the Cookie Preference Center window.

176.    The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

CLASS ACTION COMPLAINT

1    177.    Plaintiffs and Class members have suffered loss by reason of these violations,

2   including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private

3   Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to

4   control the dissemination and use of their Private Communications, and (iv) loss of their Private

5   Communications to the Third Parties with no consent.

6    178.    Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have

7   been injured by the violations of California Penal Code § 631, and each seeks statutory damages

8   of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's

9   violations of CIPA § 631(a), as well as injunctive relief.

10    179.    Unless enjoined, Defendant will continue to commit the illegal acts alleged herein

11   including, but not limited to, permitting third parties to access, intercept, read, learn, record,

12   collect, and use Plaintiffs' and Class members' electronic Private Communications with

13   Defendant.  Plaintiffs, Class members, and the general public continue to be at risk because

14   Plaintiffs, Class members, and the general public frequently use the internet to search for

15   information and content related to arts and crafts products as well as home décor products.

16   Plaintiffs, Class members, and the general public continue to desire to use the internet for that

17   purpose. Plaintiffs, Class members, and the general public have no practical way to know if their

18   request to opt out of or reject unnecessary cookies and tracking technologies will be honored

19   and/or whether Defendant will permit third parties to access, intercept, read, learn, record,

20   collect, and use Plaintiffs' and Class members' electronic Private Communications with

21   Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read,

22   learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications

23   with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action: Use of a Pen Register in Violation of the California
Invasion of Privacy Act (California Penal Code § 638.51)**

24

25    180.    Plaintiffs reallege and incorporates by reference all paragraphs alleged herein.

26

27    181.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to

28   638, includes the following statement of purpose:

CLASS ACTION COMPLAINT

The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

182.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

183.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

184.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

185.    At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

186.    Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

187.    Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by adjusting the toggle switch to opt-out of or reject all Optional cookies, including all Targeting, Social Media, Performance, and Functional cookies, in the Cookie Preference Center window before clicking the "Confirm My Choices" button.

188.    Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

189.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

190.    Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

191.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

192.    Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could opt out of or reject all Optional cookies, including all Targeting, Social Media, Performance, and Functional cookies, except the Required cookies necessary for the Website to function.

193.    However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users adjusted the toggle switch to opt-out of or reject all Optional cookies, including all Targeting, Social Media, Performance, and Functional cookies, and clicking "Confirm My Choices" in the Cookie Preference Center window. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private

Communications, even when consumers had previously chosen to opt out of or reject such cookies and tracking technologies.

194.    These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to opt out of or reject all such cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

195.    Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

196.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

197.    Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

198.    Defendant's representation that consumers could opt out of or reject unnecessary cookies (including the "cookies that collect information for analytics and to personalize your experience with targeted ads") if they adjusted the toggle switch on the "Optional" cookies tab and clicked "Confirm My Choices" in the Cookie Preference Center window was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and Cookie Preference Center window prior to their interactions with the Website. Had Defendant disclosed that it caused unnecessary third-party cookies to be stored on Website visitors' devices that are related to personalization, targeted advertising, analytics, and social media and/or share information with third parties even after they choose to opt out of or reject such cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

199.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to opt out of or reject unnecessary cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

200.    Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

201.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

202.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of unnecessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### <u>Sixth Cause of Action</u>: Unjust Enrichment

203.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

204.    Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

205.    Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "choose not to allow" certain cookies and "opt-out of the…cookies that collect information for analytics and to personalize your experience with targeted ads" and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members opted out of or rejected all such cookies.

206.    Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

207.    Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

208.    Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

209.    It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

210.    There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

211.    Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

212.    Plaintiffs pleads this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## **Seventh Cause of Action**: Trespass to Chattels

213.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

214.    Defendant, intentionally and without consent or other legal justification, caused cookies to be stored on Plaintiffs' and Class members' browsers and devices, which caused the Third Parties and Defendant to track and collect Plaintiffs' and Class members' Private Communications and use the data collected for their own advantage, as described above.

215.    Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could opt out of or reject all unnecessary cookies and tracking technologies, and through their failure to disclose that Defendant causes third-party cookies to be stored on consumers' devices and browsers, which cause the Third Parties and Defendant to track and collect Plaintiffs' and Class members' Private Communications even after consumers chose to opt out of or reject such cookies.

216.    Defendant intentionally caused third party software code to be stored onto Plaintiffs' and Class members' devices, knowing that the code would be executed by those devices. The software code then placed and/or transmitted cookies along with Plaintiffs' and Class members' Private Communications to the Third Parties. These intentional acts interfered

with Plaintiffs' and Class members' use of the following personal property owned, leased, or controlled by Plaintiffs and other users: (a) their computers and other electronic devices; and (b) their personally identifiable information.

217.    Defendant's trespass of Plaintiffs' and other users' computing devices resulted in harm to Plaintiffs and other users and caused Plaintiffs and other users the following damages:

a.       Nominal damages for trespass;

b.       Reduction of storage, disk space, and performance of Plaintiffs' and other users' computing devices; and

c.       Loss of value of Plaintiffs' and other users' computing devices.

### PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully request judgment against Defendant as follows:

A.       Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.       An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.       An award of punitive damages;

D.       An award of nominal damages;

E.       An order for full restitution;

F.       An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.       An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.       For reasonable attorneys' fees and the costs of suit incurred; and

I.        For such further relief as may be just and proper.

CLASS ACTION COMPLAINT

Dated: June 19, 2025

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT