**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Hayley Reynolds (State Bar No. 306427)
hayley@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

SONNI ECHEVERRIA-CORZAN and THOMAS SIMMONS, as individuals, on behalf of themselves, the general public, and those similarly situated,

Plaintiffs,

v.

MICHAELS STORES, INC.,

Defendant.

Case No. 3:25-cv-05839-YGR

PLAINTIFFS' OPPOSITION TO DEFENDANT MICHAELS STORES, INC. MOTION TO COMPEL ARBITRATION

Date: November 4, 2025
Time: 2:00 p.m.
Judge: Hon. Yvonne Gonzalez Rogers
Courtroom: Oakland, Courtroom 1

TABLE OF CONTENTS

I. INTRODUCTION ..... 1
II. STATEMENT OF FACTS ..... 2
A. Plaintiffs' Website Visit ..... 2
B. Rewards Account Associated with the Email: tomcarsim@yahoo.com ..... 4
III. LEGAL STANDARD ..... 4
IV. ARGUMENT ..... 5
A. Plaintiffs Never Formed an Agreement to Arbitrate ..... 5
1. Plaintiffs did not have actual notice of the Terms & Conditions ..... 6
2. Plaintiffs had no inquiry notice of the Terms & Conditions ..... 6
B. Plaintiff Simmons Did Not Agree to Arbitrate ..... 11
1. Plaintiff Simmons Did Not Create a Rewards Account ..... 11
2. The Rewards Account Sign Up is an Unenforceable Sign-In Wrap ..... 13
C. Questions of Contract Formation Cannot Be Delegated ..... 16
D. Even if a Contract Was Formed, the Arbitration Provision violates *McGill* ..... 17
E. The Case Should Not be Stayed ..... 18
V. CONCLUSION ..... 19

TABLE OF AUTHORITIES

**CASES**


*B.F. v. Amazon.com Inc.*,
No. C19-910 RAJ-MLP, 2020 U.S. Dist. LEXIS 63224 (W.D. Wash. Apr. 9, 2020) .........13

*Berman v. Freedom Fin. Network LLC*,
30 F.4th 849 (9th Cir. 2022) .......... passim

*Blair v. Rent-A-Center, Inc.*,
928 F.3d 819 (9th Cir. 2019) .......... 18

*Chabolla v. Classpass Inc.*,
129 F.4th 1147 (9th Cir. 2025) .......... passim

*Chen v. Premier Fin. All., Inc.*,
No. 18-CV-3771 YGR, 2019 U.S. Dist. LEXIS 10280 (N.D. Cal. Jan. 22, 2019)....... passim

Ghazizadeh v. Coursera, Inc.,
737 F. Supp. 3d 911 (N.D. Cal. 2024) .......... 10, 13

*Gostev v. Skillz Platform, Inc.*,
88 Cal. App. 5th 1035 (2023) .......... 19

*In re Uber Text Messaging*,
No. 18-cv-02931-HSG, 2019 U.S. Dist. LEXIS 102007 (N.D. Cal. June 18, 2019) ...........19

*Jack v. Ring LLC*,
91 Cal. App. 5th 1186 (2023) .......... 19

*Lim v. TForce Logistics, LLC*,
8 F.4th 992 (9th Cir. 2021) .......... 4

*Long v. Provide Com., Inc.*,
245 Cal App.4th 825 (2016) .......... 9, 10

*MacClelland v. Cellco P'ship*,
609 F. Supp. 3d 1024 (N.D. Cal. 2022) .......... 18

Mackey v. Airbnb,
745 F. Supp. 3d 455 (S.D. Miss. 2024).......... 11

*Magill v. Wells Fargo Bank, N.A.*,
No. 4:21-cv-01877 YGR, 2021 U.S. Dist. LEXIS 248891 (N.D. Cal. June 25, 2021) ........17

*Maldonado v. Fast Auto Loans, Inc.*,
60 Cal. App. 5th 710 (2021) .......... 18

*McArdle v. AT&T Mobility LLC*,
No. 09-cv-01117-CW, 2017 U.S. Dist. LEXIS 162751 (N.D. Cal. Oct. 2, 2017)................18

*McGill v. Citibank, N.A.*,
2 Cal. 5th 945 (2017) .......... 17, 18

*Metter v. Uber Techs., Inc.*,

No. 16-cv-06652-RS, 2017 U.S. Dist. LEXIS 58481 (N.D. Cal. Apr. 17, 2017)..................5

*Meyer v. Uber Techs., Inc.*,
868 F.3d (2nd Cir. 2017)..........................................................................................13

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) .......................................................................... passim

*Pemberton v. Rest. Brands Int'l, Inc.*,
No. 25-cv-03647-JSC, 2025 LX 394849 (N.D. Cal. Sep. 5, 2025) .......................................6

*Pemberton v. Rest. Brands Int'l, Inc.*,
No. 25-cv-03647-JSC, 2025 U.S. Dist. LEXIS 173985 (N.D. Cal. Sep. 5, 2025) ................4

*Rodriguez v. Samsung Elecs. Am., Inc.*,
No. 8:23-CV-01194-DOC-KESx,
2023 U.S. Dist. LEXIS 204950 (C.D. Cal. Nov. 14, 2023)................................................12

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) ..........................................................................................7, 13

*SF 2402 LLC v. B.F.B., Inc.*,
No. 3:21-cv-00906-BEN-JLB, 2021 U.S. Dist. LEXIS 238997 (S.D. Cal. Dec. 14, 2021).19

*Sifuentes v. Dropbox, Inc.*,
2022 U.S. Dist. LEXIS 125273 (N.D. Cal. June 29, 2022) ............................................5, 13

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*,
925 F.2d 1136 (9th Cir. 1991) ..........................................................................................5

*Weeks v. Interactive Life Forms, LLC*,
100 Cal. App. 5th 1077 (2024) ..........................................................................................6

*Youxiang Eileen Wang v. Life Ins. Co. of the Sw.*,
No. 19-cv-01150-YGR,
2019 U.S. Dist. LEXIS 218563 (N.D. Cal. Dec. 19, 2019).......................................5, 12, 13

**STATUTES**

9 U.S.C. § 2.........................................................................................................................4

## I. INTRODUCTION

Defendant Michaels Stores, Inc. ("Defendant" or "Michaels") caused cookies to be placed on Plaintiffs' devices in violation of California laws while they browsed Defendant's website www.michaels.com (the "Website") even after Plaintiffs expressly rejected all optional cookies, including targeting, social media, performance, and functional cookies. The threshold question here, however, is whether this dispute is arbitrable. It is not. The arbitration agreement by which Defendant seeks to bind Plaintiffs is contained in the Website's Terms & Conditions. The only hyperlink to the Terms & Conditions, however, was placed inconspicuously, in plain, small font, at the very bottom of the Website and is only visible after a user clicks the "Resources" menu. California law is clear that Defendant cannot bind anyone to terms presented in this manner. Accordingly, the arbitration provision is unenforceable.

Defendant still contends that Plaintiffs assented to the Terms & Conditions by virtue of their use of the Website. However, for an internet contract to be valid, the website must either place the user on actual notice of the agreement or "put[] a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). Defendant cannot show that either Plaintiff had actual or inquiry notice of the Terms & Conditions.

First, Plaintiffs never saw the Terms & Conditions, or even a reference or hyperlink to the Terms & Conditions. Thus, Plaintiffs had no *actual notice* that their use of the Website would be subject to the Terms & Conditions and the arbitration provision contained therein. Second, Defendant cannot establish inquiry notice because (1) the Website does not provide reasonably conspicuous notice of the Terms & Conditions, and (2) Plaintiffs took no action, such as clicking a button or checking a box, that unambiguously manifested their assent to the Terms & Conditions. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Simply continuing to browse a website with an arbitration provision in the terms hidden at the bottom of the Website is not enough. *Id.*

As to Plaintiff Simmons, Defendant's argument that he agreed to arbitrate his claims by virtue of a sign up to its rewards program is also incorrect. Defendant suggests that users must

enter their first name, last name, email address, and phone number to join the rewards program, but it fails to submit *any* of this evidence. For good reason. Plaintiff Simmons did not sign up for the Michaels rewards. Rather, it was his former partner with whom he shared an email address with. Defendant's omission is glaring.

The Court should deny the motion to compel and reject the request to stay.

## II. STATEMENT OF FACTS

### A. Plaintiffs' Website Visit

Defendant sells arts and crafts supplies and home décor products at over 1,300 retail locations across the United States. ECF 1 ¶ 29. Defendant owns and operates the www.michaels.com website (the "Website"), which allows visitors to receive information about its stores and products, and to purchase products. *Id.*

When Plaintiffs visited the Website, it immediately displayed to them a popup cookie consent banner in which it offers Website users the option to control how they are tracked and how their personal data is used. *Id.* ¶ 32. The Website's cookie consent banner represented that users could adjust their cookie settings by clicking "Cookie Preferences." *Id.* ¶¶ 32–34. Plaintiffs clicked the "Cookie Preferences" link and adjusted their cookie settings to reject and opt out of all non-required cookies. *Id.* Neither the cookie consent banner nor the cookie preferences window mention the Terms & Conditions. *Id.*

At no point did Plaintiffs read or even see the link to the Terms & Conditions. Simmons Decl., ¶ 11; Echeverria-Corzan Decl., ¶ 6. The Website does contain a link to the Terms & Conditions, but it is buried at the bottom of the Website inside a "Resources" menu. To find the Terms & Conditions, a user must first scroll to the bottom of the Website, as shown in the following screenshot:




Reynolds Decl., ¶ 2, Ex. A. Even after scrolling to the bottom of the Website, a user must then select the "Resources" tab which then displays a drop-down menu with the Terms & Conditions, as shown in the following screenshot:




Reynolds Decl., ¶ 3, Ex. B. The Terms & Conditions are not conspicuous. It is not, for example, in a different color or font or size from the immediately surrounding text. Nor is it highlighted or emboldened. Quite the opposite. It is hidden inside a "Resources" menu which does not even hint at the Terms & Conditions. Users of the Website would have no reason to know its existence by virtue of visiting the Website alone.

Accordingly, Plaintiffs did not know, or have any reason to know, that their use of the Website subjected them to the Terms & Conditions and the arbitration provision included therein. Indeed, Plaintiffs' understanding was that they and Defendant had agreed only that their use of the Website would not be tracked—an agreement which Defendant promptly violated. Simmons Decl., ¶ 11; Echeverria-Corzan Decl., ¶ 6.

### B. Rewards Account Associated with the Email: tomcarsim@yahoo.com.

Defendant suggests that Plaintiff Simmons had actual notices (and affirmatively assented) to the Terms & Conditions by virtue of signing up for its rewards program, but this is mistaken. Plaintiff Simmons and his prior partner, Caroline Simmons, shared the email address tomcarsim@yahoo.com. Simmons Decl., ¶ 6. The email address is short for Thomas, "tom," Caroline, "car," and Simmons, "sim." *Id.* Plaintiff Simmons has never signed up for a Michaels rewards account. *Id.* ¶¶ 5, 8. Plaintiff Simmons has also never created an account on the Michaels Website or used a Michaels reward account, including the account associated with tomcarsim@yahoo.com. *Id.* ¶ 9.

## III. LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs arbitration agreements "evidencing a transaction involving commerce." 9 U.S.C. § 2. Such agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* "In resolving a motion to compel arbitration under the FAA, 'a court's inquiry is limited to two gateway issues: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'" *Pemberton v. Rest. Brands Int'l, Inc.*, No. 25-cv-03647-JSC, 2025 U.S. Dist. LEXIS 173985, at *7–8 (N.D. Cal. Sep. 5, 2025) (quoting *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (quotation marks and citation omitted)). "If both conditions are met, the FAA requires the court to enforce the arbitration agreement in accordance with its terms." *Id.*

A court applies a standard similar to the summary judgment standard and Defendant bears the burden to prove the existence of an agreement to arbitrate, with the party opposing—Plaintiffs—receiving "the benefit of all reasonable doubts and inferences that may arise."

*Youxiang Eileen Wang v. Life Ins. Co. of the Sw.*, No. 19-cv-01150-YGR, 2019 U.S. Dist. LEXIS 218563, at *8–9 (N.D. Cal. Dec. 19, 2019) (Gonzalez-Rogers, J.) (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991); *see also Metter v. Uber Techs., Inc.*, No. 16-cv-06652-RS, 2017 U.S. Dist. LEXIS 58481, at *5 (N.D. Cal. Apr. 17, 2017). Defendant must offer enough evidence to establish actual or inquiry notice of—and therefore "mutual assent" to—its proffered terms. *Youxiang*, 2019 U.S. Dist. LEXIS 218563, at *9 ("The party seeking to compel arbitration bears 'the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence.'"); *see Sifuentes v. Dropbox, Inc.*, 2022 U.S. Dist. LEXIS 125273 at *13–14 (N.D. Cal. June 29, 2022) (finding that Defendant failed to show—by a preponderance of the evidence—that Plaintiff had actual or inquiry notice, without which "there was no manifestation of mutual assent, and the later terms of service do not impose an enforceable agreement to arbitrate.").

## IV. ARGUMENT

### A. Plaintiffs Never Formed an Agreement to Arbitrate

Contracts formed over the Internet generally take on two forms: "'clickwrap' or 'click-through' agreements, in which website users are required to click on an 'I agree' box after being presented with the terms of an agreement, and 'browsewrap' agreements in which the terms of the agreement are posted on the website and indicate that the user is agreeing to the terms simply by continuing to use the website." *Chen v. Premier Fin. All., Inc.*, No. 18-CV-3771 YGR, 2019 U.S. Dist. LEXIS 10280, at *7 (N.D. Cal. Jan. 22, 2019) (Gonzalez-Rogers, J.) (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014)). A clickwrap agreement will be enforced when "the user indicates actual notice of the terms of the agreement or was required to acknowledge the terms of the agreement before proceeding with further use of the site." *Id.* (citing *Nguyen*, 763 F.3d at 1176–77). Enforcement of browsewrap agreements, "which lacks such an acknowledgement, will depend upon whether the website's design and content would put 'a reasonably prudent user on inquiry notice of the terms of the contract.'" *Id.* (citing *Nguyen*, 763 F.3d at 1177). "The conspicuousness of the terms and notices, as well as the overall design of the webpage, will contribute to the determination that a user was on inquiry notice." *Id.* at *7–

8; *see, e.g.*, *Chabolla v. Classpass Inc.*, 129 F.4th 1147, 1155 (9th Cir. 2025); *Weeks v. Interactive Life Forms, LLC*, 100 Cal. App. 5th 1077, 1087 (2024). This case presents nothing more than an unenforceable browsewrap agreement.

**1. Plaintiffs did not have actual notice of the Terms & Conditions**

Setting aside the rewards program from Mr. Simmons, Defendant does not argue that Plaintiffs had actual notice of the Terms & Conditions. Nor could it because the neither the cookie consent banner nor Cookie Preference Center required an agreement or acknowledgement to the Terms & Conditions before further use of the Website. ECF 1 ¶¶ 32, 34, 112–115, 122–125; *Chen*, 2019 U.S. Dist. LEXIS 10280, at *7. Indeed, Plaintiffs browsed the Website and did not know that their use of the Website was subject to additional terms, including the Terms & Conditions. Simmons Decl. ¶ 11; Echeverria-Corzan Decl. ¶ 6.

In *Pemberton v. Rest. Brands Int'l, Inc.*, Judge Corley recently rejected a motion to compel with facts strikingly similar to this case. No. 25-cv-03647-JSC, 2025 LX 394849, at *9 (N.D. Cal. Sep. 5, 2025). There, the plaintiff visited the defendant's website and adjusted his cookie consent settings to "opt out of, decline, and/or reject all non-required cookies and other tracking technologies." *Id.* at *3–4. The defendant moved to compel arbitration based on plaintiff's use of the website. *Id.* at *6–7. The plaintiff submitted a declaration, attesting to his website visit and not knowing that his "continued use of the website was subject to arbitration." *Id.* The court found that plaintiff did not have actual notice because the "[p]laintiff attest[ed] that he did not know about the Terms of Service's arbitration terms when he visited the website" and "no reasonable trier of fact could find [p]laintiff had actual knowledge." *Id.* at *9–10. The same result should follow here.

**2. Plaintiffs had no inquiry notice of the Terms & Conditions**

Defendant argues that "Plaintiffs assented to the Terms and Conditions, including the Arbitration Agreement, through their use of the Michaels Website." ECF 20 at 11; *id.* at 12 ("Plaintiffs unambiguously manifested their assent to the Terms by continuing to use the Website."). But this misapplies California law because the Terms & Conditions is indisputably an unenforceable browsewrap agreement. *Chen*, 2019 U.S. Dist. LEXIS 10280, at *7 (Gonzalez-

Rogers, J.) ("'browsewrap' agreements in which the terms of the agreement are posted on the website and indicate that the user is agreeing to the terms simply by continuing to use the website . . . lacks . . . acknowledgement [and] will depend upon whether the website's design and content would put 'a reasonably prudent user on inquiry notice of the terms of the contract.'""); *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 466 (2021) ("[C]ourts have reached consistent conclusions when evaluating the enforceability of [browsewrap] agreements . . . , generally finding . . . [them] to be unenforceable.").

"[A]n enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network LLC*, 30 F.4th 849, 856 (9th Cir. 2022). To be reasonably conspicuous, "a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Id.* Reasonably conspicuous notice allows a website operator to disclose "terms and conditions through a hyperlink, [but] the fact that a hyperlink is present must be readily apparent. Simply underscoring words or phrases . . . will often be insufficient to alert a reasonably prudent user that a clickable link exists." *Id.* at 857 (citing *Sellers*, 289 Cal. Rptr. 3d at 29).

Here, the Website does not provide reasonably conspicuous notice for several reasons. First, the Terms & Conditions link is inside the "Resources" menu. Thus even if a Website user did scroll all the way to the bottom of the page and read the small font at the bottom, the user would not see the terms and conditions link at all. And even in the unlikely event that a Website user clicked the "resources" tab that would result in a menu of options, the user still would not be on notice of the terms of use because the link is in the same color, same font, and same font size as the other options inside the "Resources" menu. Reynolds Decl., ¶ 3, Ex. B.[1] Indeed,

[1] Even considering Defendant's argument that the Terms & Conditions link "is also visible while viewing the Privacy Policy, directly above the link to the Privacy Policy" (ECF 20 at 5), it fails inquiry notice for the same reasons. A user that opts to reject cookies is not required to look at, agree to or read the privacy policy, and nothing about seeing a link to the privacy policy would put a user on notice of the arbitration clause within a separate Terms & Conditions. Even so,

Plaintiffs did not see the Terms & Conditions link and understood that Defendant and Plaintiffs only agreed that their continued use of the Website would not be tracked. Simmons Decl. ¶ 11; Echeverria-Corzan Decl. ¶ 6. Thus, here, just as in *Berman*, "[t]he text disclosing the existence of the terms and conditions on these websites is the antithesis of conspicuous. It is printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye." *Berman*, 30 F.4th at 856. Defendant's Website is "[f]ar from meeting the requirement that a webpage must take steps 'to capture the user's attention and secure her assent,' the design and content of these webpages draw the user's attention away from" the Terms & Conditions link. *Id.* at 857.

Defendant's browsewrap agreement is much worse than those held inadequate by the Ninth Circuit and California courts. For example, in *Nguyen*, the Ninth Circuit set forth a bright-line rule that "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Id*. at 1178–1179. Indeed, the terms of use in *Nguyen* were <u>more</u> conspicuous than Defendant's Website here. There, the defendant's website included a "'Terms and Conditions' link . . . either directly below the relevant button a user must click on to proceed in the checkout process or just a few inches away. On some pages, the content of the webpage is compact enough that a user can view the link without scrolling. On the remaining pages, the hyperlink is close enough to the 'Proceed with Checkout' button that a user would have to bring the link within his field of vision in order to complete his order." *Id.* at 1178. Still, the Ninth Circuit concluded that the links were insufficiently prominent to place the plaintiff on inquiry notice of the terms of use. *Id.* The court reasoned that, "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the breadth of the range of technological savvy of online

---

Defendant has failed to support this argument with any evidence and must be rejected. *Chen*, 2019 U.S. Dist. LEXIS 10280, at *8 ("Defendants have not offered evidence explaining the design and content of the webpage or how the [agreement] appeared on the [] website.").

purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Id*. at 1179.

Similarly, in *Long v. Provide Com., Inc.*, 245 Cal App.4th 825 (2016), the California Court of Appeals endorsed the Ninth Circuit's analysis in *Nguyen*. The court concluded that the party was not on inquiry notice of the browsewrap agreement because the hyperlinks to the terms of use were so difficult to find. *Id.* at 863. The court even criticized websites which "merely display[] a hyperlink in a prominent or conspicuous place" because "without notifying consumers that the linked page contains binding contractual terms, the phrase 'terms of use' may have no meaning or a different meaning to a large segment of the Internet-using public." *Id.* at 867.

Finally, recently in *Chabolla v. Classpass Inc.*, the Ninth Circuit found that the defendant's notice to its terms of use, which "resemble[d] something between clickwrap and browsewrap[,]" was insufficient because of its "distance from relevant action items, its placement outside of the user's natural flow, and its font—notably timid in both size and color, we find that it is 'deemphasized by the overall design of the webpage' and not 'prominently displayed.'" 129 F.4th 1147, 1154, 1157 (quoting *Berman*, 30 F.4th at 857). There, the terms of use was listed "in the smallest font on the page," and the words "Terms of Use" and "Privacy Policy" were in blue, with the rest of the text in gray. *Id*. at 1152.

As explained above, Defendant's browsewrap agreement is much worse than those held inadequate in *Nguyen*, *Long*, and *Classpass* because the Terms & Conditions link is buried inside a second "Resources" menu at the very bottom of the Website or inside the Privacy Policy. Thus, the Website does not even "display a hyperlink in a prominent or conspicuous place" as required by *Long.*

Even if the Terms & Conditions link had been visible and conspicuous when Plaintiffs accessed the Website, Plaintiffs never took any action to manifest their assent to the terms. Simmons Decl. ¶¶ 10–11; Echeverria-Corzan Decl. ¶¶ 5–6. Defendant argues that Plaintiffs "own allegations establish they were not passive users of the Michaels website [because] they took deliberate steps to investigate and configure their privacy settings." ECF 20 at 11–12. But

"merely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything. A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857.

As this Court explained in *Chen*, simply because a consumer registered an account on the website, i.e., clicked buttons, does not mean they would have been on notice of the terms. 2019 U.S. Dist. LEXIS 10280, at *8–10. Here, nothing anywhere says that clicking any of the buttons in the cookie consent banner or Cookie Preferences Center constitutes consent or agreement in any form to the Terms & Conditions. ECF 1 ¶¶ 32–34; ECF 21-1. By clicking "Cookie Preferences" and opting out of cookies, Plaintiffs were clearly not manifesting assent to anything other than the non-use of optional cookies, which Defendant ignored. Simmons Decl. ¶¶ 10–11; Echeverria-Corzan Decl. ¶¶ 5–6. Defendant's reliance on *Ghazizadeh v. Coursera, Inc.*, is misplaced because the plaintiff in that case received the arbitration agreement through email and the plaintiff did not submit counter evidence that he did not receive the agreement. 737 F. Supp. 3d 911, 933 (N.D. Cal. 2024) (noting the plaintiff "does not contend that he did not receive the email" and did "not submit[] any counter evidence that he did not receive the email updates").

Defendant next argues that "the placement of the Terms and Conditions [is] conspicuous" because it is "available on every page in the footer" and "[t]he current cookie banner includes a link to the Privacy Policy, and once a user navigates to the Privacy Policy, a link to the Terms and Conditions is visible directly above the link to the Privacy Policy in the Resource Center menu." ECF 20 at 12. But the *Long* court explained that a user was not on inquiry notice when the agreement was at the bottom of the webpage beneath multiple layers of footers and were displayed in a green typeface that "could blend in with the . . . site's lime green background." 245 Cal App.4th at 866. Defendant's Website is far worse because a user must click either the "Resources" tab at the bottom of the Website or click on the Privacy Policy link which then reveals the Terms & Conditions link. Moreover, Plaintiffs are not required to click and read the Privacy Policy when making cookie selections. Defendant once again fails to establish

Plaintiffs—or anyone—would be on notice such that the arbitration terms were binding. Indeed, the Ninth Circuit explained that "consumers cannot be expected to ferret out hyperlinks to terms and conditions[.]" *Nguyen*, 763 F.3d at 1178–79. But that is exactly what Defendant expects Plaintiffs to do here.

Moreover, Defendant does not argue that the Privacy Policy incorporates the Terms & Conditions by reference, as it implicitly admits when it simply states that "the Privacy Policy itself refers to the Terms and includes the Michaels Text Messaging Terms and Conditions, which contain a similar arbitration provision." ECF 20 at 12. The fact that the Michaels Text Messaging Terms and Conditions, which Plaintiffs did not register for, require arbitration also does not show Plaintiffs assented to the Terms & Conditions of the Website.

Defendant's reliance on *Wargo v. Lavandeira* and *Mackey v. Airbnb* is similarly misplaced. In *Wargo*, the plaintiff specifically alleged that she read the terms on the website. *Wargo*, No. CV 09-2717-GHK-EX, ECF 52 at 3 (C.D. Cal. Dec. 18, 2009). Moreover, the plaintiff moved to compel arbitration based on "[d]efendant's prior arguments to the Ohio district court, wherein [d]efendant relied upon the forum selection provision in the Conditions of Use in seeking dismissal or transfer." *Id.* at 2. For these reasons, the court held that the plaintiff "had at least constructive, if not actual, knowledge of the Website's Conditions of Use." *Id.* at 3. In *Mackey*, an out-of-circuit case, the defendant's terms were found to be a "clickwrap agreement" because "all prospective members are directed to a 'Before you join' screen which visibly hyperlinks to the Terms of Service" and "[p]rospective members are then given the option to either 'Agree' or 'Decline' agreement with the Terms of Service by affirmatively clicking an option." 745 F. Supp. 3d 455, 461 (S.D. Miss. 2024). This is a far cry from the facts of this case.

**B. Plaintiff Simmons Did Not Agree to Arbitrate**

**1. Plaintiff Simmons Did Not Create a Rewards Account**

Defendant does not argue Plaintiff Echeverria-Corzan created a rewards account. Instead, Defendant argues that Plaintiff Simmons "assented to the Arbitration Agreement when he created his Rewards account on the Website" through a clickwrap agreement. ECF 20 at 10. Defendant supports this contention with a single line in Bach's declaration which states "[o]n

October 3, 2023, Plaintiff Thomas Simmons signed up for a Michaels Rewards account on its Website." ECF 21 ¶ 5. But this bare assertion does not support Defendant's position. Defendant does not evidence an agreement with Plaintiff. Instead, the Bach declaration exhibit, at best, "[is] the equivalent of blank form contracts, with no clear indication that these plaintiffs agreed to them." *Berman v. Freedom Fin. Network, LLC*, No. 18-cv-01060-YGR, 2020 U.S. Dist. LEXIS 160406, at *7 (N.D. Cal. Sep. 1, 2020) (Gonzalez Rogers, J.).

As explained in Plaintiff Simmons declaration, he shares an email with his prior partner. Simmons Decl. ¶¶ 6–7. Plaintiff Simmons did not create a Michaels account. *Id.* ¶¶ 5, 9. Plaintiff Simmons believes his prior partner signed up for the Michaels rewards account. *Id.* ¶ 7. Plaintiff Simmons did not authorize anyone to create the rewards account and has never used the rewards account. *Id.* ¶¶ 8–9. Courts have consistently held that a party is not bound to an agreement to which they did not agree to. *See, e.g., Youxiang*, 2019 U.S. Dist. LEXIS 218563, at *9 (Gonzalez-Rogers, J.) (denying motion to compel when plaintiffs submitted unrebutted declarations stating another person created their website account and that "they never saw the terms . . . including the arbitration provision"); *Rodriguez v. Samsung Elecs. Am., Inc.*, No. 8:23-CV-01194-DOC-KESx, 2023 U.S. Dist. LEXIS 204950, at *9 (C.D. Cal. Nov. 14, 2023) (rejecting defendant's argument that the plaintiff's email address alone shows he agreed to arbitrate when "[i]n a sworn declaration, Plaintiff stated that he does not recall creating a Samsung account and explained that, sometimes, his wife uses his email address when creating online accounts. Thus, it may have been Plaintiff's wife who created the account."); *B.F. v. Amazon.com Inc.*, No. C19-910 RAJ-MLP, 2020 U.S. Dist. LEXIS 63224, at *3 (W.D. Wash. Apr. 9, 2020) ("As a general rule, non-signatories are not bound by arbitration clauses.").[2]

Defendant glaringly omits *any* identifying information about Plaintiff Simmons purported sign up despite showing the Court that it would possess the reward card holder's first name, last name, email address, and phone number as collected through the sign up process. ECF

[2] Direct benefits estoppel does not apply here because Plaintiff Simmons is not a third-party beneficiary and Plaintiff Simmons did not benefit from the sign up because he has never used the rewards account or shopped on the Website. Simmons Decl. ¶¶ 3–5, 9; *see Nguyen*, 763 F.3d at 1179.

21 ¶ 5. This omission renders Defendant's contention unsupported. Even if taken at face value, there is a dispute of material fact regarding the account registration such that Plaintiff Simmons cannot be forced to arbitrate his claims. *See Youxiang*, 2019 U.S. Dist. LEXIS 218563, at *9 (Gonzalez-Rogers, J.) (Court denied motion to compel arbitration where there was a dispute of fact regarding who registered for the account); *Chen*, 2019 U.S. Dist. LEXIS 10280, at *8–9 (denying motion to compel arbitration when defendants offered no evidence in support of their motion to compel); *Sifuentes*, 2022 U.S. Dist. LEXIS 125273 at *7 ("the party seeking to compel arbitration bears the burden of proving the existence of the agreement by a preponderance of the evidence").

Defendant's reliance in *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 918-19 (N.D. Cal. 2024), is misplaced because, as Defendant states, users in that case "sign[ed] up" but Plaintiff Simmons here did not sign up to anything which required an agreement to terms, nor did he create an online or rewards account. Simmons Decl. ¶¶ 3–5, 8–9. Even so, as discussed below, the rewards account sign up is an unenforceable clickwrap agreement.

**2. The Rewards Account Sign Up is an Unenforceable Sign-In Wrap**

Even if Mr. Simmons were somehow bound by his former partner's sign up for the rewards program, courts have "routinely found clickwrap agreements enforceable." *Berman*, 30 F.4th at 856 (*citing Meyer v. Uber Techs., Inc.*, 868 F.3d at 75 (2nd Cir. 2017)). A clickwrap agreement requires users to click on an "I agree" box after being presented with a list of terms and conditions. *See Sellers*, 73 Cal. App. at 464; *Nguyen*, 763 F.3d at 1176–77 (same). A "sign-in wrap lives somewhere in the middle [of clickwrap and browsewrap agreements]: the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms." *Classpass*, 129 F.4th at 1154. Because Defendant's Rewards sign up "provides a link to the Terms [& Conditions] but does not require that the user actually read them before moving on to purchase a subscription, the website most closely resembles a 'sign-in wrap agreement.'" *Id.* A sign-in wrap agreement may be enforceable "based on inquiry notice if (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking

a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* at 1154–55.

As this Court noted in *Berman v. Freedom Fin. Network, LLC*, the Ninth Circuit's decision in *Nguyen* found the "website was insufficient to bind the consumer because it contained no admonition to 'review terms' or otherwise prompt the user to take affirmative action to demonstrate assent to the terms at issue, including the arbitration clause." 2020 U.S. Dist. LEXIS 160406, at *5. This Court noted that the terms in *Nguyen* were: (1) "either directly below the relevant button a user must click on to proceed in the checkout process or just a few inches away[;] (2) "the content of the webpage is compact enough that a user can view the link without scrolling. . . [or] is close enough to the 'Proceed with Checkout' button that a user would have to bring the link within his field of vision in order to complete his order;" and (3) the "checkout screens [] contained 'Terms of Use' hyperlinks in underlined, color-contrasting text." *Id.* at 4–5.

Preliminarily, the Bach declaration states that Plaintiff Simmons "signed up for a Michaels Rewards account on its Website." ECF 21 ¶ 5. Defendant does not indicate whether the sign up was done on a computer or a phone. Below is a screenshot of the sign up page from November 15, 2023, as captured by the Wayback Machine on a mobile phone:



Reynolds Decl. ¶ 4, Ex. C. The Terms appear in small font below the giant red "Sign Up" button. This sign up screen is nearly identical to the sign up screen that this Court and the Ninth Circuit held failed to put users on notice of the terms. *Chabolla v. Classpass Inc.*, No. 4:23-cv-00429-YGR, 2023 U.S. Dist. LEXIS 122616, at *10–12 (N.D. Cal. June 22, 2023); *Classpass*, 129 F.4th at 1157. Below is a screenshot of the *Classpass* sign up:




Reynolds Decl. ¶ 5, Ex. D.

Defendant submits the supposed sign-up screen at the time it claims an account was created for Plaintiff Simmons. But the screenshot included in the declaration (ECF 21 ¶ 6) differs from Exhibit B, which is where the declaration claims the screenshot comes from. *Compare* ECF 21 ¶ 6 *with* ECF 21-2 at 3 (Exhibit B). Plaintiff will address only the Sign-Up screen in Exhibit B as it is the only evidence. Similar to the mobile sign up, the Terms only appear after a user has entered their name, email, phone number, created a password, and indicated selections regarding their age, email sign up preferences, and sign in preferences. *Compare* Reynolds Decl. ¶ 5, Ex. D; ECF 21-2. Then, a user is presented with a large red Sign-Up button that is as wide as the webpage. *Id*. A consumer may not even scroll far enough to see the Terms statement, and the Terms statement does not include indication of an agreement to arbitrate. The sentence indicating that a user would agree to Terms is not only below the Sign-Up button but also in small front

size in gray color on a gray background. While the Terms are in blue font, they are not underlined to indicate a hyperlink, in contrast to the "Details" blue hyperlink directly above the Terms statement. Just as in *Classpass*, the Terms statement is "outside of the user's natural flow," and the font is "notably timid in both size and color." 129 F.4th at 1157.

Defendant argues that the Terms are "bolded and hyperlinked," but the only bolded Terms link appears inches above the "Sign Up" button, to the right of the "Michaels Rewards" logo, and far from the statement indicating a user would agree to the Terms by signing up. *See* ECF 20 at 6. In addition, the Terms statement is directly underneath check boxes that the user would read and indicate their selections. After such selections, a user's eyes would naturally flow first to and be apt to click on the large inviting red "Sign Up" bar without needing to read any other text on the page. As such, even if Plaintiff Simmons signed up for the Michaels rewards account (he did not), he still was not on notice that the sign up was subject to Terms & Conditions, including the arbitration provision.

Defendant does not come close to satisfying its burden to show mutual assent. The Bach declaration does not indicate if the user who created the Rewards account on the Website used a computer, mobile phone, or tablet to create the account, and does not provide evidence that it was in fact Plaintiff Simmons that created the account. ECF 21. The screenshot in the declaration is contradicted by the Exhibit it purports to come from. *Compare* ECF 21 ¶ 6 *with* ECF 21-2. And regardless of which sign up flow is analyzed, users are not put on notice that they were agreeing to arbitrate disputes. Thus, Defendant failed to establish assent to Defendant's Terms & Conditions, and the Court should deny the Motion in full.

**C. Questions of Contract Formation Cannot Be Delegated**

Defendant asserts that "the Arbitration Agreement expressly incorporates the AAA rules, including AAA Consumer Arbitration Rule R-14 . . . [and] Plaintiffs agreed to delegate any dispute relating to scope or arbitrability to the arbitrator when he [sic] assented to the Arbitration Agreement." ECF 20 at 13–14. That is dead wrong.

Many courts in the Ninth Circuit, including this Court, have found that "[w]here at least one party is unsophisticated, judges in this district routinely find that the incorporation of the

AAA rules is insufficient to establish a clear and unmistakable agreement to arbitrate arbitrability." *Magill v. Wells Fargo Bank, N.A.*, No. 4:21-cv-01877 YGR, 2021 U.S. Dist. LEXIS 248891, at *15 (N.D. Cal. 2021) (Gonzalez-Rogers, J.) (collecting cases). In *Magill*, this Court found that "incorporation of the[] [AAA] rules does not clearly and unmistakably establish an agreement to delegate questions of arbitrability, because customers of Wells Fargo, including [plaintiff], could not be expected to understand that the incorporation of the AAA rules would mean that the overwhelming majority of disputes arising out of the Account Agreement would be resolved by an arbitrator." *Id.* at *16. Here too, Plaintiffs have submitted declarations stating that they did not know their continued use of the Website would subject them to arbitration. Thus, the purported delegation provision found in the AAA rules cannot be applied to Plaintiffs.

**D. Even if a Contract Was Formed, the Arbitration Provision violates *McGill***

The failure to prove Plaintiffs' assent to the contract renders all aspects of Defendant's Terms & Conditions inapplicable. However, even if a contract was formed, the Court still cannot compel arbitration because the Terms & Conditions, including the arbitration provision, prohibits public injunctive relief in violation of *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017).

The relevant portion of the purportedly applicable Terms & Conditions state:

> An arbitrator may award on an individual basis any relief that would be available in a court, including injunctive or declaratory relief to the extent required to satisfy your individual claim, and must follow and enforce this Agreement as a court would.

ECF 21-2 at 16. The Terms & Conditions also include a class action waiver which states:

> You and we each agree that any proceeding, whether in arbitration or in court, will be conducted only on an individual basis and not in a class, consolidated or representative action. If a court or arbitrator determines in an action between you and us that this class action waiver is unenforceable, this Arbitration Section will be void as to you.

*Id.* at 17. These provisions prohibit an arbitrator from awarding public injunctive relief because it only allows the arbitrator to "***award on an individual basis***" "including ***injunctive or declaratory relief to the extent required to satisfy your individual claim***."

Public injunctions are defined as "relief that has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public." *Blair v. Rent-A-Center,*

*Inc.*, 928 F.3d 819, 824 (9th Cir. 2019) (quoting *McGill,* 2 Cal. 5th at 951). Plaintiffs here seek a public injunction because they seek to stop deceptive, unfair, and/or unlawful practices directed at the public in violation of California's consumer protection statutes, CIPA, and other laws. *See, e.g.*, ECF 1 ¶¶ 5, 30, 32–42, 119, 129, 133, 141–145, 154–156, 175–176, 178–179, 187–188, 199, and p. 70 Prayer for Relief; *see Maldonado v. Fast Auto Loans, Inc.*, 60 Cal. App. 5th 710, 721 (2021) ("an injunction under the CLRA against [defendant's] unlawful practices will not directly benefit the [plaintiffs] because they have already been harmed and are already aware of the misconduct. As stated in *McGill*, any benefit to the [plaintiffs] is incidental to the 'general public benefit of enjoining such a practice.'") (citation omitted).

California courts have held that similar provisions violate *McGill*. *See, e.g., MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1037 (N.D. Cal. 2022) (holding *McGill* violated when the agreement stated "the arbitrator may award money or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim."); *McArdle v. AT&T Mobility LLC*, 2017 U.S. Dist. LEXIS 162751, at *3 (N.D. Cal. 2017) (holding *McGill* violated when the agreement stated "[t]he arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim."); *Gostev v. Skillz Platform, Inc.*, 88 Cal. App. 5th 1035, 1059 (2023) (holding *McGill* violated when "the arbitration provision specifies the 'arbitrator may award declaratory or injunctive relief only to you individually, and only to the extent required to satisfy your individual claim.'"); *Jack v. Ring LLC*, 91 Cal. App. 5th 1186, 1205 (2023) ("terms in arbitration agreements that . . . limit arbitration awards to 'an individual basis,' and limit injunctive relief in arbitration to awards 'only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim' are all commonly understood by the parties who agree to these terms to mean public injunctive relief is not available in arbitration.").

### E. The Case Should Not be Stayed

Despite presenting no evidence which merits compelling Plaintiffs to arbitrate their claims, Defendant argues a stay is warranted "[w]hen a district court finds that a lawsuit

'involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." ECF 20 at 15. But as explained above, Defendant has not shown that Plaintiffs are subject to arbitration or that their claims fall within the scope of arbitration. *SF 2402 LLC v. B.F.B., Inc.*, 2021 U.S. Dist. LEXIS 238997, at *18 (S.D. Cal. Dec. 14, 2021) ("Because the Motion to Compel Arbitration here is denied, and thus this case will not be subject to arbitration, the Motion to Stay is denied as moot.").

At a minimum, Plaintiff Echeverria-Corzan's claims are not subject to arbitration because Defendant has not submitted *any* evidence showing her assent to the Terms & Conditions. *See In re Uber Text Messaging*, No. 18-cv-02931-HSG, 2019 U.S. Dist. LEXIS 102007, at *28 (N.D. Cal. June 18, 2019) ("Because the Court denied the motion to compel arbitration, there is no basis to stay the case as to either Ziers or Rogers. Accordingly, Uber's motion to stay is DENIED."). Thus, there is no basis to stay her claims.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court fully deny Defendant's motion to compel and request to stay.

Dated: October 3, 2025

**GUTRIDE SAFIER LLP**

*/s/ Hayley Reynolds*

Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Hayley Reynolds (State Bar No. 306427)
hayley@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*